# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-WC-00694-COA

**HOWARD INDUSTRIES, INC.**
APPELLANT/
CROSS-APPELLEE

**v.**

**SELINA HAYES**
APPELLEE/
CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2021 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANT /CROSS-APPELLEE: | ROBERT P. THOMPSON LAURA WALSH GIVENS |
| ATTORNEYS FOR APPELLEE /CROSS-APPELLANT: | ROGER K. DOOLITTLE FLOYD E. DOOLITTLE |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 10/11/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2021-WC-00695-COA

**HOWARD INDUSTRIES, INC.**
APPELLANT/
CROSS-APPELLEE

**v.**

**SELINA HAYES**
APPELLEE/
CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2021 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |

ATTORNEYS FOR APPELLANT  ROBERT P. THOMPSON
  /CROSS-APPELLEE:  LAURA WALSH GIVENS
ATTORNEYS FOR APPELLEE  ROGER K. DOOLITTLE
  /CROSS-APPELLANT:  FLOYD E. DOOLITTLE
NATURE OF THE CASE:  CIVIL - WORKERS' COMPENSATION
DISPOSITION:  ON DIRECT APPEAL: AFFIRMED.
  ON CROSS-APPEAL: AFFIRMED -
  10/11/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., McDONALD AND WESTBROOKS, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. This is a consolidated appeal from one order addressing two consolidated worker's compensation claims filed by Selina Hayes for injuries she suffered in 2007 and 2015 at Howard Industries Inc.'s plant in Laurel, Mississippi. The Mississippi Worker's Compensation Commission (MWCC) order affirmed an administrative judge's (AJ) ruling that imposed sanctions and attorney's fees against Howard Industries' attorney for misleading the MWCC and delaying the proceedings. The MWCC also affirmed the AJ's award of permanent disability benefits to Hayes, albeit in a lesser amount than the AJ awarded.

¶2. Howard Industries appeals from the full Commission's order, arguing that the sanctions and attorney's fees are unwarranted and that Hayes suffered no loss of wage-earning capacity as a result of her 2007 injury or industrial loss of use as a result of her 2015 injury. Hayes cross-appeals and argues that the sanctions and attorney's fees should be assessed against Howard Industries itself, its expert witness, and the attorney. Having reviewed the record, arguments of parties, and relevant precedent, we affirm the full

2

Commission's order.

**Facts**

*A.     Hayes's MWCC Claims*

¶3.     On June 28, 2007, while working as a coil winder at Howard Industries, Hayes tripped over an airhose, fell backward, and injured her head, neck, shoulder, and back.[1] She received medical treatment, but no surgery was required.  At the time of her injury, Hayes was earning $12.43 per hour (or $510 per week).  Hayes began receiving benefits from Howard Industries, which is self-insured for worker's compensation coverage.  Hayes reached maximum medical improvement (MMI) from this injury on September 24, 2008, and her doctors said that she could return to work at medium level with some lifting restrictions.  Her doctor indicated that she suffered a 2% whole person impairment to her cervical spine and a 5% whole person impairment to her lumbar spine.  Hayes returned to her coil winder position, which entailed lifting twenty-pound to one-hundred-pound coils of wire above shoulder height, while she pursued her entitlement to compensation for permanent disability benefits because of the impairments noted by her doctor (MWCC Cause No. 070775-M-6861).[2]

¶4.     In April 2015, Hayes earnings as a coil winder had increased to $13.43 per hour, and

---

[1] Hayes first worked at Howard Industries in 1995 and 1996, left for a period of time, and returned thereafter.  Altogether, Hayes had worked eighteen years at Howard Industries at the time of the appeal.

[2] It is unclear from the record when Hayes filed her MWCC claim for the 2007 injury or what actions were taken on it until she was injured again in 2015.  The two claims were later consolidated in 2019.

with overtime, she made $672.47 per week. However, on April 14, 2015, while lifting eight-gauge wire over her head, Hayes injured both her arms, shoulders, back, and neck. On April 27, 2015, Hayes underwent surgery on her right shoulder and received worker's compensation payments while she was not working.

¶5.     On February 4, 2016, Hayes filed a petition to controvert with the MWCC concerning this second injury (MWCC Cause No. 1503857-P-0960-D). She claimed that Howard Industries had failed to pay permanent disability benefits. On February 25, 2016, Howard Industries filed an answer denying that Hayes had suffered any temporary or permanent disability from the injury or any loss of wage-earning capacity.

¶6.     Thereafter, Howard Industries' claims consultant, Larry Jackson, filed several notices with the MWCC concerning payments made to Hayes. On September 17, 2015, acknowledging Hayes's temporary total disability, Jackson reported that payments of $463.50 per week were being paid. On April 29, 2016, Jackson reported that Hayes's payments were suspended and were last paid on April 11, 2016, because Hayes had returned to work on April 12, 2016.

¶7.     On January 31, 2017, Hayes's treating physician, Dr. Richard O'Keefe, determined that Hayes had reached maximum medical improvement with the following restrictions: no above shoulder work and a twenty-pound-lifting restriction. He also determined that she had a 5% permanent partial impairment of the right shoulder from her on-the-job-injury. Dr. O'Keefe had previously also referred Hayes to Joey Cooley at Genesis Physical Therapy who evaluated Hayes and prepared a Functional Capacity Evaluation (FCE) on January 13, 2017.

4

Cooley determined that Hayes could only work five days a week for a total of forty hours per week with no lifting above her shoulders and a weight limit of twenty pounds. Dr. Rhett Hobgood had also performed a similar evaluation on January 26, 2017, and opined that she had a 5% impairment to her right upper extremity. He agreed with both Cooley and O'Keefe in their findings of impairment and future work restrictions.

¶8. Howard Industries accommodated Hayes on her return to work by giving her the position of coil winder trainer, which did not require her to handle the wire but only to instruct trainees on how to do the job. In that position, Hayes made $14.18 per hour (or $567.20 per week). However, where other coil winder trainers had to work overtime (up to twenty hours per week),[3] Hayes was restricted to working only forty hours per week and therefore, she did not earn what the other coil winder trainers actually made.

¶9. On February 14, 2019, Hayes moved the MWCC to consolidate her 2007 injury claim with her 2015 injury case. Howard Industries replied that it would not oppose consolidation, if the trial date, which had been set for the first case, be vacated. On March 6, 2019, the AJ consolidated the cases.

B. *Pre-hearing Vocational Experts and Reports*

*(1) Peter Mills for Howard Industries*

¶10. On April 30, 2019, Howard Industries' attorney, Richard Lewis Yoder, filed a pre-hearing statement identifying Peter Mills as an expert in vocational rehabilitation and attaching a report Mills had prepared. The company had engaged Mills to prepare a

---

[3] In its contract for employees, the workers' union had agreed that Howard Industries could require overtime hours as part of a job's requirements.

vocational report "for job analysis of the position of coil winder trainer." In a written report dated April 25, 2019, Mills summarized Hayes's medical records that he reviewed, including those of Dr. O'Keefe and Dr. Hobgood who assessed Hayes's physical limitations. Mills then described the position of a coil winder trainer and concluded that it was within the physical limitations set by Hayes's medical doctors. Mills also attached a form to that report, which summarized the coil winder trainer's job description and work hours, including daily hours from 7:00 a.m. to 5:30 p.m., six days a week, and twenty hours a week of overtime. This job analysis clearly showed that Hayes' no-overtime-work restriction resulted in loss of wages compared to what other coil winder trainers made.

¶11.    However, three days later, on May 2, 2019, Yoder filed a supplemental pre-hearing statement, with "Attachment 4" that read "Vocational Labor Market Reports," provided Mills's name and address, and stated, "Mr. Mills will testify live at this hearing pursuant to his vocation report dated April 25, 2019, with corrected Job Analysis." This was followed with Mills's April 25, 2019 written opinion, unchanged, with a new summary form indicating that coil winder trainers worked 7:00 a.m. to 3:30 p.m. only five days a week with no overtime.    With this new attachment, Mills's report now reflected that the coil winder position at Howard Industries did not include overtime and that Hayes suffered no loss of earnings.

### (2) Bruce Brawner for Hayes

¶12.    On April 18, 2019, Bruce Brawner, Hayes's vocational expert, issued a report based on his interview with her on March 1, 2019, and his review of her medical records and work

6

history.  He reviewed both jobs Hayes had held—the coil winder position she had before and after her 2007 injury, as well as  the coil-winder trainer position she was given after her 2015 injury.  Brawner stated that according to the Department of Labor, the coil winder position is classified as  "heavy" work.  He noted the physical requirements that each job required, including but not limited to lifting, standing, sitting, pushing, et cetera.  Brawner also reviewed the medical findings from the various doctors who treated or assessed Hayes for both her 2007 and 2015 injuries and the restrictions they placed on her after each injury.  He noted that as a result of the 2007 injury, Dr. Vohra determined that Hayes had a impairment of 2% to the whole person for her cervical spine and 5% to the whole person for her lumbar spine.  Brawner reviewed Hayes's employment history and determined what skills and abilities she had at those times.

¶13.    Brawner opined that as a result of her 2007 injury, Hayes sustained a 13% loss of access to her pre-injury jobs.  He also opined that she had an 11% loss of access to the jobs she may be qualify for under the "Guide to Occupational Exploration."  Using the larger number of jobs in the Department of Labor's "Dictionary of Occupational Titles," Brawner determined that Hayes had a 10% loss of access due to the 2007 injury.  He further determined that in these jobs, Hayes was capable of earning $9.57 per hour (or $382.80 per week).  This was definitely less than the $510.40 she was earning as a coil winder at the time of her injury and when she returned to work.

¶14.    Brawner performed a similar analysis to conclude a loss of access to jobs due to Hayes's 2015 injury, using the 5% permanent impairment to Hayes's right shoulder assessed

by Dr. O'Keefe. He concluded that she had the same percentages of loss of access to outside jobs that she had from the 2007 injury and would be making only $9.57 per hour in the jobs she could perform in the market given the restrictions caused by her 2015 injury. In a supplemental report, however, after Brawner reviewed FCE's of Drs. O'Keefe and Hobgood, Brawner revised his opinions about Hayes's loss of access to work outside Howard Industries. He concluded that she had a 25% loss of access to her pre-injury jobs, a 38% loss of access to jobs identified in the Guide to Occupational Exploration and a 42% loss of access to the occupations listed in the Dictionary of Occupational Titles.

¶15. On May 8, 2019, Hayes deposed Brawner, for hearing purposes and his deposition was later entered as an exhibit at the hearing. He reviewed Mills's written report with the initial attachment and noted that he and Mills were in agreement that Hayes could no longer do coil winder work but that she could perform the lighter job of coil winder trainer. But, he added, Hayes was limited to working only forty hours per week. In that deposition, Brawner pointed out that a computation of loss due to injury was usually based on a comparison between what the worker made prior to the injury and what the worker made after. In this case, Hayes had made $600 per week as a coil winder (including overtime) prior to her 2015 injury, and at the time of his deposition, she was currently making $567.20 per week in her position as coil winder trainer, for a weekly loss of $32.80. However, Hayes's attorney pointed out that Hayes also lost the overtime pay other trainers made because of her forty-hour-per-week work restrictions. Calculating an overtime rate of $21.27 (one-and-a-half times the normal hourly rate) times twenty-six hours of overtime each week,

8

Hayes's attorney computed an additional loss to Hayes of $553.02 each week that Hayes could not receive because she could not work overtime in her current position. Brawner confirmed that the loss of an ability to work overtime was an indicator of a loss of wage-earning capacity in this case.

¶16. In his deposition, Brawner also reviewed his own opinions contained in his April 18, 2019 report and supplemented in his April 27, 2019 report. Brawner said that Hayes could perform the coil winder trainer position with the overtime limit restriction assigned to her after her 2015 injury, and that she had a 38–42% loss of access to jobs outside of Howard Industries should she have to leave. However, Brawner was clear that these calculations of loss of access were not conclusive proof of a loss wage-earning capacity or functional impairment. Instead, these calculations were merely one element experts use to determine the loss of wage-earning capacity. His report included nine jobs that Hayes might be able to perform outside of Howard Industries with various levels of pay, which averaged $9.57 per hour and which totaled a weekly wage of $382.80. On May 21, 2019, Hayes filed an amended consolidated pre-hearing statement to which she attached Brawner's May 8, 2019 deposition.

### C. AJ Hearing on June 4, 2019

¶17. On June 4, 2019, the AJ convened a hearing on "the existence, nature and extent of [the] disability attribution to [Hayes's] injury or injuries." After entering the stipulations of the parties concerning the job titles, dates and extent of injuries, and hourly pay rates, the AJ admitted several stipulated exhibits, including Hayes's medical records, Dr. Hobgood's

9

evaluation, Dr. O'Keefe's FCE, the deposition of Bruce Brawner and his vocational rehabilitation evaluation, and Mills's April 25, 2019 report with the May 2, 2019 revised attachment (labeled Exhibit 14). According to the stipulations, Hayes's 2015 pre-injury wages as a coil winder were $13.43 per hour; in her accommodated position, Hayes earned $14.18 per hour.

¶18. Hayes called Howard Industries's expert Mills as her first witness. After being questioned about his company, the extent of work done for Howard Industries,[4] and the income received from that work,[5] Mills testified about Exhibit 14, the vocational report that Howard Industries provided on May 2, 2019. In the written portion of that report, Mills said that he was retained to perform "a job analysis of the position of coil winder trainer at Howard Industries, Department 131." He said that he visited the facility on February 26, 2019. During this two-hour visit, Mills spoke to Elton Buxton (supervisor), Walter Todd (supervisor and general foreman), and John Risher (health and safety manager). Mills also observed what coil winder trainers did. Mills said his job was to provide a job analysis of a coil winder trainer, which included an evaluation of the job's physical demands.

¶19. Hayes' attorney then presented Mills with his initial report with its initial attachment provided by Howard Industries on April 30, 2019, which was entered into evidence as Exhibit 17. Mills admitted that the attachment to this initial report indicated that trainers

[4] Mills said that he and those in his company do pre-cert work and case management work for Howard Industries as well as other companies. However, Mills only testified for Howard Industries, never against it.

[5] Mills did not know the exact figure but testified that his company made over $100,000 per year from its contracted services for Howard Industries.

work six days a week with approximately twenty hours of overtime, although he said he did not confirm this with the employees he had spoken to at the facility. He testified that Hayes did what all other trainers did, except she was only allowed to work five days a week. Mills agreed that other trainers worked overtime as noted in the initial attachment to his written report and that he did not know, but would not dispute, that coil winder trainers averaged between twenty-one and twenty-three hours a week. Contradicting the written portion of his report that stated he had been retained to evaluate the job of coil winder trainer, Mills then testified that the first attachment to his written report was a "mistake" and that he meant to evaluate the job given to Hayes as a specific accommodation for her alone, not what the general position of coil winder trainer entailed. Mills and Hayes's attorney continued discussing what Mills then characterized as "clerical errors" made in the first attachment to the report. Mills testified that the hours, days, and overtime worked in the that first attachment were "typographical error[s]" put in accidentally. Mills confirmed that he made no change to the written portion of his report to note that it was "revised" or "amended" in any way to indicate that it was now an evaluation of only the job given to Hayes to accommodate all her restrictions. Mills agreed that using the initial attachment to his report, Hayes could not perform the trainer's job from the standpoint of hours. Mills also said that he changed the report because Howard Industries's attorney Yoder called him and told him the information was incorrect. Mills said he no longer had his working notes in the file but that either his secretary or he inadvertently put the work hours and overtime information in the first report incorrectly.

11

¶20.    In light of this testimony, Hayes's attorney asked the AJ to recess the hearing so he could secure time records of other coil winder trainers because the Mills report submitted by Howard Industries as evidence (Exhibit 14) represented that the job did not require overtime. He accused Mills of perpetrating a fraud on the court and lying.  Howard Industries' attorney Yoder responded that when Mills testified that other trainers probably worked overtime, Mills was telling the truth.  Yoder said that Hayes was limited to forty hours per week and that Howard Industries was accommodating her.  But Hayes's attorney pointed out that to determine any loss of wages or wage-earning capacity, Hayes' accommodated job needed to be compared to the regular coil winder trainer job itself.  Therefore, the revised job evaluation (Exhibit 14) presented by Mills was flawed.

¶21.    The AJ said the issue was important enough to recess the hearing so that Mills could obtain the information about the overtime requirements of the coil-winder-trainer job.  The AJ noted that job evaluations are important in worker's compensation decisions and that there appeared to be "some sort of miscommunication or something in that regard."  Yoder offered to provide whatever records were needed.  The AJ recessed the hearing, reset it for September 11, 2019, and instructed Yoder not to talk to Mills because Mills was still testifying.

### D.    *Activities During Recess*

¶22.    Over the next few months, Hayes's attorney subpoenaed the wage records of all coil winder trainers from Howard Industries and subpoenaed financial records from Mills personally and his corporations.  Hayes also increased the number of witnesses she intended

12

to call to establish the true earnings and overtime requirements for coil winder trainers, and Howard Industries subpoenaed several of those witnesses for depositions. The AJ heard motions to quash these subpoenas[6] and Hayes pared down her list of witnesses.

¶23. The MWCC docket reflects that on January 3, 2020, the AJ reset the recessed hearing for March 23, 2020; then for June 5, 2020; then for August 10, 2020; and finally for September 23, 2020. There were no motions or orders in the record to reflect the reason for these continuances; however, we presume that the COVID-19 outbreak may have caused some of this delay.[7]

¶24. Hayes also retained and designated another vocational expert, Kathy Smith, whose reports were provided to Howard Industries. Howard Industries filed a motion to strike Smith because of the lateness of her retention and because the hearing had technically already begun. There was no ruling in the record on this motion, but Smith did testify at the hearing that was later convened.

### E. Hearing Reconvened

¶25. The previously recessed hearing reconvened on September 23, 2020. Mills resumed testifying and was asked again about his affiliation with Howard Industries and the two

---

[6] On August 29, 2019, the AJ quashed the subpoena to Mills and ordered that the lay witnesses Hayes identified be deposed. Thereafter, three of the witnesses filed motions to quash their subpoenas or limit questioning during their depositions because they had their own MWCC claims pending. At a hearing on November 22, 2019, Hayes withdrew these three individuals as witnesses and on November 26, 2019, the AJ issued an order relieving them of compliance to the deposition subpoenas.

[7] We take judicial notice that during this time, COVID-19 restrictions were in place, and many courts were closed and/or cases continued. The full Commission's order indicated that part of the delay in this case was due to COVID-19.

reports he had prepared. It was established that Mills's company billed Howard Industries $10,000 per month for pre-certification work performed by a nurse. Mills again testified that his company earned over $100,000 per year from its contract with Howard Industries. In addition, Mills charged $1,500 for job evaluations such as those he performed for the Hayes case.

¶26. Hayes's attorney presented Mills with job evaluations that Mills had prepared in other worker's compensation cases to show that Mills normally evaluated the actual job without accommodation just as Mills did in his initial report in Hayes's case.[8] Mills agreed that if the AJ accepted Mills's second report, Exhibit 14, that Howard Industries had advocated, the judge would have to conclude that Hayes had no wage-earning loss.

¶27. Thereafter, Hayes called her supervisor, Elton Buxton, who testified that the coil winder trainers worked six days a week with approximately twenty hours of required overtime but that Hayes had been accommodated and worked only forty hours a week. As a result, she was losing that overtime pay. Buxton recalled that Mills came to the job site, but he could not recall if Mills asked him about overtime. But if Mills had, then Buxton said that he would have told him that coil winder trainers, except Hayes, were required to work overtime.

¶28. Hayes herself testified to the jobs she has had prior to and while working at Howard Industries. She explained the physical requirements of each job. She also testified that she

---

[8] Walter Todd, a general foreman in the binding department at Howard Industries, testified and identified the names of the workers in these other job evaluations shown to Mills. Todd identified them as Howard Industries employees.

14

takes Aleve everyday for pain and Lortab (but only on the weekends because Lortab makes her sleepy). Hayes testified that as the treasurer of the local union, she knew that her wages were governed and set by the union contract. She confirmed that because she could not work overtime in her current position as coil winder trainer, she was losing a significant amount of pay, which she estimated to be between $500 and $600 per week.

¶29. Hayes then called Kathy Smith who testified about her vocational reports[9] and her opinions concerning Hayes's loss of wage-earning capacity because of her 2007 injury and her industrial loss of use as a result of the 2015 injury to her right shoulder. Smith testified that comparing the wages Hayes was earning as a coil winder in 2007 to the wages she would have made doing jobs she had done in the past, which Smith determined would be only $399.60, if Hayes had lost her job at Howard Industries, she would suffer a 33% loss of wages. Making the same comparison to the wages Hayes was earning as a coil winder trainer, had Hayes lost her job then, she would suffer a 59% loss of wages. Smith also testified about Hayes's loss of access to employment due to both injuries. Smith opined that Hayes sustained an average 9.8% loss of access to the labor market from the 2007 injury and a 39% loss of access to the labor market from her 2015 injury. Smith confirmed that her opinions were nearly identical to those of Brawner, with the only difference being the mathematical computations of the percent of loss of wage-earning capacity and job access because Smith's computations were generated by the computer , and Brawner did his by hand.

_____

[9] Smith prepared an initial report on August 21, 2020, an updated report on September 3, 2020, and an amended report on September 9, 2020.

¶30. Howard Industries re-called Mills to the stand in its defense. Mills confirmed that he had not spoken to Howard Industries' attorney Yoder since the last hearing except to receive notices of the hearing dates. Mills also testified that Yoder had never told him to falsify an expert report. Mills again reiterated that his task was to evaluate Hayes's job only—no one else's. Mills agreed with Brawner's opinion that Hayes had been appropriately placed by Howard Industries as a coil winder trainer with no overtime work required. However, Mills gave no opinion about Hayes's loss of wage-earning capacity.

¶31. At the close of the hearing, Hayes's attorney moved the AJ to sanction Howard Industries, its counsel, and its expert $10,000 each. The attorney argued that Mills's second report (Exhibit 14) was a fraud on the court and that it should be stricken from the record. He further requested that his attorney's fee be paid as an additional penalty because he had to subpoena records and witnesses to establish that Howard Industries' Exhibit 14 was false. He argued that nowhere in Mills's second report did he state that the evaluation was for the accommodated job as performed by Hayes alone. Only Mills's testimony at the hearing and the admission of the first report (Exhibit 17) revealed this.

¶32. On November 4, 2020, Howard Industries filed a written response to the oral motion Hayes had made for sanctions and attorney's fees. Howard Industries argued that it had treated Hayes fairly and properly with respect to accommodating her and keeping her employed. Howard Industries also argued that Hayes's attorney had manufactured an alleged conspiracy regarding its expert, Mills, who submitted two reports, both of which were produced to Hayes. Howard Industries argued that the reports were not fraudulent just

because Hayes' attorney did not understand them. In addition, Howard Industries argued Hayes' experts did not criticize Mills. Moreover, Howard Industries maintained that any delay in the proceedings came from Hayes' attorney, who subpoenaed documents and designated new witnesses but then opposed their depositions. Howard Industries then requested that Hayes's attorney be sanctioned and pay attorney's fees.

*F.     AJ Opinion and Clarified Opinion*

¶33.   On December 18, 2020, the AJ issued a comprehensive and detailed fifty-nine page opinion, which included a review of the testimony and evidence and rendered its findings. In the opinion, the AJ concluded that Hayes sustained a loss of wage-earning capacity as a result of her restrictions and impairments from the 2007 injury. The AJ found that with respect to her 2015 injury, Hayes had sustained an industrial loss of use to her right upper extremity that resulted in a 42% loss of access to jobs in her geographical area and a 38% loss of access to jobs in Mississippi. The AJ further concluded that Howard Industries' accommodation of Hayes after her 2015 injury rendered her current higher wages as an unreliable indication of her future ability to earn wages in the open labor market outside Howard Industries.

¶34.   The AJ further determined:

> The collective testimony and the second report penned by Pete Mills are intended to convey a material misrepresentation of material fact designed to bring about a finding by this Administrative Judge that Claimant's position as coil winder trainer was not an accommodated job. The two reports apparent in this claim cause a major obfuscation of the facts and circumstances and would appear to question the validity of the report's content.
>
> Mr. Mills' second report is not based on facts in evidence but on

representations made to him by Employer's counsel, Lew Yoder. The AJ also found that Mills's financial ties to Howard Industries could compromise his testimony as an expert. The AJ found that the discrepancies in Mills's reports had caused a delay in the proceedings for over a year and resulted in a delay of payment of benefits to the claimant. The AJ imposed a $1,000 civil penalty against Howard Industries pursuant to Mississippi Code Annotated section 71-3-59 (Rev. 2021)[10] and ordered Howard Industries to pay Hayes benefits consistent with the order. The AJ also ordered Howard Industries to pay $1,500 to Hayes for attorney's fees.

¶35. On December 22, 2020, Hayes filed a motion to correct the AJ's order. Hayes requested that the AJ specifically state the amounts of benefits owed to her. Thereafter, the

---

[10] Section 71-3-59 provides:

(1) If the court having jurisdiction of proceedings in respect of any claim or compensation order determined that the proceedings in respect of such claim or order have been instituted or continued without reasonable ground, the costs of such proceedings shall be assessed against the party who has so instituted or continued such proceedings.

(2) If the full commission determines that proceedings in respect to a claim have been instituted, continued or delayed, including by way of appeal to the commission, without reasonable ground, the full commission shall require the party who has so instituted, continued or delayed such proceedings or the attorney advising such party, or both, to pay the reasonable expenses, including attorney's fees, caused by such institution, continuance or delay to the opposing party. In addition to requiring the payment of reasonable expenses, including attorney's fees, to the opposing party, the commission may levy a civil penalty not to exceed Ten Thousand Dollars ($10,000.00) against such party, or attorney advising or assisting such party, or both, payable to the commission. Any such civil penalty levied and collected by the commission shall be deposited into the Administrative Expense Fund provided for in Section 71-3-97 and any such penalty which is not voluntarily paid may be collected by civil suit brought by the commission.

18

AJ issued a sixty-page "clarified order" in which the AJ specified that Hayes was to be paid $129.45 per week for 450 weeks for her 2007 injury, with credit for amounts already paid, and that for the 2015 injury, Hayes be paid $463.59 per week for 76 weeks, with credit for amounts already paid. The penalty and attorney's fees amounts remained the same.

¶36. On December 22, 2020, Howard Industries filed its petition for review of the case by the full Commission.

*G.     Full Commission Order*

¶37. On May 19, 2021, the full Commission issued its order on Howard Industries's petition for review. The MWCC reviewed the AJ's "Clarified Order" and the evidence presented. The MWCC affirmed the AJ's findings that Hayes sustained a loss of wage earning capacity from her 2007 injury and a loss of industrial use to her shoulder from her 2015 injury. The MWCC affirmed the AJ's grant of benefits but amended the award of permanent partial disability payments for the 2007 injury and, calculating them based on the stipulated average weekly wage, the MWCC awarded Hayes permanent partial benefits for that injury in the amount of $73.27 per week for a period of 450 weeks with proper credit to the employer, if any. The MWCC further affirmed the AJ's finding that Hayes sustained a 38% loss of industrial use of the right arm from the 2015 injury and awarded her 76 weeks of permanent- partial disability benefits in the amended amount of $451.52 per week with proper credit to the employer, if any.

¶38. The MWCC also affirmed the AJ's award of sanctions and attorney's fees but amended the order to require Yoder to pay the sanctions and fees. The MWCC reviewed the

19

two job evaluations presented by Mills, which differed only in the regular and overtime hours worked by coil winder trainers. The MWCC noted that Howard Industries had argued that Hayes was performing a legitimate production job with no loss of wage-earning capacity. But, the MWCC found the evidence was clear that Hayes could not perform the job "as to its regular schedule[d] requirements" and that she was unable to earn an average of twenty hours overtime per week that other coil winder trainer were able to earn. The MWCC found that because the accommodation to Hayes was an essential factor to determine her entitlement to permanent disability, the report "obscured this determination especially when coupled with the position taken by the Employer and the testimony of Mills." The AJ recessed the hearing to determine the daily schedule and overtime requirements of Hayes's position, causing a delay in the proceedings. The MWCC noted that the second hearing was delayed because of other factors including COVID-19, but the initial delay was caused by Howard Industries. The MWCC felt that the nature of evidence submitted by Howard Industries and the questions concerning the veracity of that evidence caused the MWCC to "spend enormous and unusual time and effort to determine this matter [the issue of Hayes's permanent disability] that, without such misleading evidence, would be a typical determination by the Commission." The MWCC determined that the report, as the heart of a central issue, was misleading in that it "was devoid of any indication that the original report had been amended." Further, had it been presented in isolation, the job analysis referred to would have resulting in a determination that Hayes had no loss of wage-earning capacity. The Commission affirmed the award of sanctions and attorney's fees but ordered Yoder to

20

personally pay both because the evidence showed that the report was changed at Yoder's specific instructions and offered by Yoder to the MWCC. The MWCC added that "the matter rises to a level of concern that further investigation into the veracity of the evidence offered may be required by the Mississippi Bar Association under Rule 3.3(4), Candor to the Tribunal."

### H.    Appeal

¶39.    On June 17, 2021, Howard Industries appealed from the full Commission's order. Howard Industries claims that there was no evidence to support the award of sanctions and attorneys fees against either Yoder or Howard Industries. The corporation further contended that the MWCC had erred in finding that Hayes sustained a loss of wage-earning capacity from her 2007 injury, and that the Commission's finding of a 38% loss of industrial use as a result of the 2015 injury was not supported by substantial evidence. On June 18, 2021, Hayes cross-appealed, contending that the MWCC should have assessed attorney's fees and sanctions not only against Yoder, but also against Howard Industries and against Mills personally.

## Standard of Review

¶40.    "The standard of review in worker's compensation cases is limited by the substantial evidence test." *Chambers v. Howard Indus. Inc.*, 310 So. 3d 833, 835 (¶6) (Miss. Ct. App. 2021) (quoting *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 489 (¶11) (Miss. Ct. App. 2004)). We will not reverse a Commission order unless it is clearly erroneous and contrary to the overwhelming weight of the evidence. *Id*. (citing *Smith v. B.C. Rogers*

21

*Processors Inc.*, 743 So. 2d 997, 1002 (¶13) (Miss. Ct. App. 1999)). A Commission decision on the issues of fact and credibility of witnesses must be given deference. *Kroger Co. v. Pybus*, 327 So. 3d 678, 683 (¶15) (Miss. Ct. App. 2021).

¶41. In Mississippi, our appellate courts apply an abuse-of-discretion standard in reviewing a judge's issuance of sanctions. *Ill. Cent. Gulf R. Co. v. McLain*, 174 So. 3d 1279, 1284 (¶12) (Miss. 2015). "The decision to award sanctions will be affirmed unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon [the] weighing of relevant factors." *Laws v. Louisville Ladder Inc.*, 146 So. 3d 380, 384 (¶11) (Miss. Ct. App. 2014) (internal quotation marks omitted). However, questions of law are reviewed de novo. *Id.*

### Discussion

I.    **Whether the evidence to supported the award of sanctions and attorney's fees against Yoder, Howard Industries, or Mills.**

¶42. The MWCC affirmed the AJ's imposition of a $1,000 sanction and the payment of $1,500 in attorney's fees but ordered that only Howard Industries' attorney Yoder pay those penalties. The MWCC reasoned that liability rested with Yoder because it was he who had Mills change the report and he who presented the misleading report to the MWCC. Howard Industries argues that there was no evidence to support such an award, against either it or Yoder. In her cross-appeal, Hayes argues that not only Yoder, but Howard Industries and its expert Mills as well should be ordered to pay the sanctions and attorney's fees.

¶43. The MWCC is authorized by statute to impose a civil penalty up to $10,000 and order a party or the party's attorney to pay a reasonable attorneys fee if either delays a proceeding

without reasonable ground.[11]  However, the provisions of the workers' compensation statutes dealing with sanctions are to be strictly construed, and "the presumptions are against one claiming a statutory penalty and all questions of doubt are resolved in favor of the one against whom the penalty is sought to be imposed." *Miss. Transp. Comm'n v. Dewease*, 691 So. 2d 1007, 1016 (Miss. 1997).  For example,  "[p]arties should not be sanctioned for making reasonable legal arguments in support of their positions." *Gamma Healthcare Inc. v. Est. of Grantham*, 334 So. 3d 85, 94 (¶24) (Miss. 2022).

¶44.    In *Gamma Healthcare*, the supreme court also held that section 71-3-59(2) sanctions are analogous to sanctions imposed under Mississippi Rule of Civil Procedure 11 and Mississippi Code Annotated section 11-55-5 (Rev. 2019) ("Mississippi Litigation Accountability Act"). *Gamma Healthcare*, 384 So. 3d at 94 (¶22).  Concerning sanctions imposed under section 11-55-5, the supreme court has held that sanctions are authorized when any claim or defense is asserted without "substantial justification" or when conduct by an attorney caused unnecessary delay or harassment. *In re Spencer*, 985 So. 2d 330, 338

---

[11]  Mississippi Code Annotated section 71-3-59(2) provides:

(2) If the full commission determines that proceedings in respect to a claim have been instituted, continued or delayed, including by way of appeal to the commission, without reasonable ground, the full commission shall require the party who has so instituted, continued or delayed such proceedings or the attorney advising such party, or both, to pay the reasonable expenses, including attorney's fees, caused by such institution, continuance or delay to the opposing party. In addition to requiring the payment of reasonable expenses, including attorney's fees, to the opposing party, the commission may levy a civil penalty not to exceed Ten Thousand Dollars ($10,000.00) against such party, or attorney advising or assisting such party, or both, payable to the commission. . . .

(¶26) (Miss. 2008).[12] In *Bean v. Broussard*, 587 So. 2d 908, 911 (Miss. 1991), the supreme court held that Rule 11 "vests in our trial courts discretionary authority to impose sanctions upon parties or attorneys."

¶45.     In other workers' compensation cases, when considering sanctions, this Court has examined whether the sanctioned conduct violated any rule or reported case. *Wright v. Turan-Foley Motors Inc.*, 269 So. 3d 160, 174 (¶7) (Miss. Ct. App. 2018) (holding that sanctions are not appropriate if there were no rules or reported cases that clearly prohibited the conduct sanctioned by the Commission). For example, in *Minor v. RGT Management. Inc.*, 271 So. 3d 644, 649-50 (¶21) (Miss. Ct. App. 2018), we reversed a $500 sanction imposed on claimant's counsel for his failure to pursue a motion to reinstate his client's claim because no rule or reported case required Minor's counsel to take any further action after he filed a  motion to reinstate.

¶46.     There has been no reported worker's compensation sanctions case involving conduct similar to the conduct in this case where the MWCC found that the attorney for Howard Industries had submitted an expert report concerning a claimant's post-injury job requirement that would have mislead the MWCC concerning the claimant's loss of earnings and wage-earning capacity. However, in other contexts the Mississippi Supreme Court and this Court have found it is impermissible for a party to lie or mislead the court. For example, in *Allen*

---

[12] "[T]he Litigation Accountability Act permits a court to impose sanctions on an attorney who 'asserted any claim or defense, that is without substantial justification, or . . . was interposed for delay or harassment' or if the attorney 'unnecessarily expanded the proceedings by other improper conduct." *In re Spencer*, 985 So. 2d 330, 338 (¶26) (Miss. 2008).

24

*v. National Railroad Passenger Corp.*, 934 So. 2d 1006, 1013 (¶19) (Miss. 2006), our

supreme court affirmed the imposition of Rule 37 sanctions when a party knowingly made

false statements during discovery.[13]  In that case Allen, an assistant conductor, sued Amtrak

under the Federal Employer's Liability Act for an injury he sustained on the job.  *Id*. at 1008

(¶2).  During discovery, Allen denied any prior back injury.  *Id*.  But Amtrak learned that

Allen had suffered disc injuries to his back in a prior job and collected workers'

compensation.  *Id*. at (¶3).  Sanctioning Allen for giving false responses, the trial court

dismissed his case with prejudice.  *Id*.  It found that Allen's "failure to disclose his prior

accident, resulted from willfulness or bad faith, and not from the inability to comply."  *Id*.

at 1013 (¶18).  The Mississippi Supreme Court affirmed, stating:

> We afford the trial judge considerable, though not unfettered, discretion in
> cases such as the one before us today.  In order to reverse the trial court today,
> this Court would have to hold a definite and firm conviction that the trial court
> committed a clear error of judgment and abuse of discretion.

*Id*. at (¶19).  The Supreme Court in *Pierce v. Heritage Properties Inc.*, 688 So. 2d 1385, 1391

(Miss. 1997), also stated:

> As we have stated before in a case where an attorney concealed potentially

---

[13] Rule 37(a) of the Mississippi Rules of Civil Procedure provides that a party can file a motion to compel discovery to, among other things cure evasive or incomplete answers, and if the motion is granted, under subsection (4) the court is authorized to impose sanctions:

> If the motion is granted, the court shall, after opportunity for hearing, require
> the party or deponent whose conduct necessitated the motion or the party or
> attorney advising such conduct or both of them to pay to the moving party the
> reasonable expenses incurred in obtaining the order, including attorney's fees,
> unless the court finds that the opposition to the motion was substantially
> justified or that other circumstances make an award of expenses unjust.

significant facts and evidence, "we are in agreement that appropriately sanctioning [the attorney] for his clear misconduct in this matter will thereby maintain the integrity of our adversary process and that to conclude otherwise would be to give this Court's seal of approval to a system which places technical accuracy above that which should be the common goal of all its participants-to learn "the truth, the whole truth and nothing but the truth." *The Mississippi Bar v. Land*, 653 So. 2d 899, 910 (Miss.1994). The same reasoning applies to a client who knowingly gives false testimony.

¶47. In another case, *Eaton Corp. v. Frisby*, 133 So. 3d 735, 751-52 (¶59) (Miss. 2013), the supreme court affirmed a judgment of $1,560.642.83 in monetary sanctions for intentional discovery violations. In that case, Eaton responded to an interrogatory, saying it had no agreement with Mr. Georgeff, a former Frisby employee that Frisby contended had stolen proprietary information. *Id.* at 737, 748 (¶¶2, 50). The special master appointed in the case and the circuit court found this response was false, *id*. at 748 (¶51), especially when Eaton's consulting agreement with Georgeff was disclosed in other litigation. *Id.* at 751 (¶59). The supreme court agreed, noting again that the courts have "considerable" discretion in the area of sanctioning parties and the appellate court will affirm unless there was a "clear error of judgment in the conclusion" the trial court reached "weighing the relevant factors." *Id*. at 747 (¶45). The special master had concluded that Eaton's responses to interrogatories were prepared with an "intent to be inaccurate and misleading." *Id.* at 749 (¶53). The supreme court determined:

> Here, as [special master] Dunbar found, Eaton took affirmative actions to conceal the consulting agreement, and Eaton's continuing evasive representations and failures of Eaton's counsel to produce the promised communications to Frisky were evidence of an intent to mislead and "hide the ball."

*Id*. at 751 (¶58). Moreover, Eaton's transgression caused "substantial expenses and waste

26

of time for Frisky with regard to discover information critical to Frisby's case." *Id*. at 752 (¶59).  Accordingly, the Court found no abuse of discretion by the circuit court in deciding to impose the monetary sanction. *Id.* at (¶60).

¶48.    In this case, Howard Industries argues that there was no reasonable ground for imposing sanctions on either it or Yoder because Yoder only had Mills "correct" an allegedly "incorrect" report.  However, the opposite occurred.  Mills had prepared a correct analysis of the coil winder trainer position, with the correct hours such employees worked, including overtime. Yoder then instructed Mills to prepare an altered report.  An accurate analysis of the coil winder trainer position was critical for the MWCC to determine if (1) Hayes had been accommodated, and more importantly, (2) whether Hayes's 2015 injury had resulted in a loss of wage-earning capacity.  Mills's first report clearly showed that Hayes was not making as much as other coil winder trainers, which would have supported her claim for a loss of wage-earning capacity.  Mills's revised report, however, which provided inaccurate information as to the true wages and hours worked by employees in the position, could have misled the MWCC to decide that Hayes was simply placed in another job at the plant making higher wages, and thus had no wage-earning-capacity loss.

¶49.    Here, Yoder was required to be truthful to the MWCC.  Presenting truthful evidence and testimony to the MWCC is so important an obligation that the Worker's Compensation statutes makes it a crime to present false or misleading evidence in order to withhold benefits.  *See* Miss. Code Ann.§ 71-3-69 (Rev. 2021).[14]  Moreover, under Rule 3.3 of the

---

[14] "Any person who willfully makes any false or misleading statement or representation for the purpose of obtaining or wrongfully withholding any benefit or

Mississippi Rules of Professional Conduct,[15] Yoder had a duty of candor to the MWCC. When the MWCC found that he had misled them, Yoder clearly breached these duties and was appropriately sanctioned. Although Yoder argues that he merely was correcting an incorrect report, Mills admitted he only prepared the second report at Yoder's instruction with information Yoder provided. Moreover, Mills's second written report did not state that he was now evaluating an accommodated job specifically performed by Hayes only; rather it still indicated that it was an analysis of the regular coil winder trainer job.[16] There was no reasonable basis for Mills to prepare the allegedly "corrected" job analysis or for Yoder to submit it.

¶50.    The MWCC found that the misleading nature of Mills's testimony and the reports

---

payment under this chapter is guilty of a felony and on conviction thereof may be punished by a fine of not to exceed Five Thousand Dollars ($5,000.00) or double the value of the fraud, whichever is greater, or by imprisonment not to exceed three (3) years, or by both fine and imprisonment." Miss. Code Ann. § 71-3-69 (Rev. 2021).

   [15] Rule 3.3 (Candor Toward the Tribunal) provides "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client; (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." Miss. R. Prof. Conduct 3.3.

   [16] The dissent contends that the Commission would not be mislead by Mills's second report because "the cover page for the corrected Job Analysis stated it was a '*corrected* Job Analysis.'" However, Mills never entitled his second report as a *corrected* Job Analysis; it was Yoder who said that the report was corrected in his "Attachment" to his May 2, 2019 supplementation. Moreover, the Job Analysis form attached to Mills's first report was undated, but the second one, attached to Yoder's May 2, 2019 supplementation, was—it was back-dated to match the date of the written report, April 25, 2019. The second report was obviously not created on April 25, and back-dating it was, simply put, not true.

offered by Yoder caused unnecessary delay in the proceedings, not only before the AJ but on appeal before the MWCC as well. Yoder filed Mills's initial report on April 25, 2019, and the "corrected" report on May 2, 2019. The hearing on Hayes's claim began on June 6, 2019. Although Mill explained the differences between the two analyses he prepared, the AJ still recessed the hearing in order for the claimant to secure the information necessary to support the use of Mills's initial report. This took Hayes's attorney time and money for the issuance of subpoenas for wage records of other coil winder trainers to make a record of the truth of the initial report. In addition, securing information to validate the first report delayed the proceedings further. Accordingly, the record supports the Commission's finding that Yoder's conduct caused a delay in the proceedings.

¶51. To exonerate Yoder for his actions Howard Industries argues that Mills's testimony, in which Mills explained the differences between the reports should be considered as well as the reports themselves, noting that experts are allowed to elaborate on their written opinions. *Holladay v. Holladay*, 776 So. 2d 662, 672 (¶44) (Miss. 2000). Rightly so, and here Mills was allowed to testify at length about his reports, their meaning, and how they came to be prepared. The AJ did not restrict Mills. In fact, it was Mills's unrestricted testimony that Yoder instructed him to prepare a new report that caused further concern to the AJ and to the Commission on review.

¶52. We have held that "the Commission is the ultimate fact-finder in a workers' compensation case, and 'decisions by the Commission on issues of fact and credibility' must be given deference." *Kroger*, 327 So. 3d at 683 (¶15) (quoting *Imperial Palace Casino v.*

29

*Wilson*, 960 So. 2d 549, 552 (¶9) (Miss. Ct. App. 2006)). Even strictly construing the sanctions section of the workers' compensation statute, because the MWCC's decision is supported by substantial evidence, and we are not firmly convicted of any error by the Commission, we find no basis to disturb the ruling.

## II. Whether Howard Industries and/or Mills should have been sanctioned.

¶53. In her cross-appeal, Hayes raises the single issue of whether the MWCC erred by not sanctioning Mills or Howard Industries itself. But in her reply brief to the issues Howard Industries raised, where Hayes should have fully presented her arguments on the issue on cross-appeal, Hayes writes only two paragraphs. In the one paragraph on the liability of Howard Industries, without citing any supporting legal authority, she claims that Yoder was an employee and agent of Howard Industries who caused Mills to make material misleading misrepresentations. In a second paragraph concerning the culpability of Mills personally, again citing no supporting legal authority, Hayes merely says that Mills submitted misleading documents, causing unreasonable delay. But

> [a]rguments advanced on appeal must contain the contentions of the Appellant with respect to the issues presented and the reasons for those contentions with citations to the authority, statutes, and parts of the record relied on." M.R.A.P. 28(a)(6). Failure to cite authority to support an argument renders an issue procedurally barred.

*Wackenhut Corp. v. Fortune*, 87 So. 3d 1083, 1094 (¶35) (Miss. Ct. App. 2012) (citations omitted). Because Hayes failed to cite any authority or present a proper argument on her

30

issue on cross-appeal, that issue is procedurally barred, and we need not address it in detail.[17]

¶54.    Notwithstanding the procedural bar, we find no error in the Commission's directive that Yoder alone pay the sanctions and attorneys fees. It is undisputed that: Yoder presented Mills' second report to the AJ representing that it was an accurate evaluation of a coil winder trainer position; Yoder called Mills and instructed him to change his report; and Yoder argued to the MWCC that he was merely asking Mills to correct a "mistake" in the report when it was obvious no "mistake" had been made. The MWCC found this to be misleading and the Mississippi Supreme Court has held that sanctions are appropriate upon a finding of misrepresentation to the court. *See Est. of Pannagl v. Lambert*, 166 So. 3d 39, 43 (¶¶12-13) (Miss. Ct. App. 2014) (finding failure to disclose document written by testator showing that he intended to change his will was a misrepresentation warranting sanctions). No proof was presented that Yoder acted on the instructions of Howard Industries that would make the company liable under any theory of agency. Moreover, section 71-3-59(2) authorizes the MWCC to impose sanctions on a party and/or its attorney, not against an expert witness, such as Mills. Accordingly, we affirm the Commission's sanctioning Yoder alone.

### III.    Whether the Commission erred in finding that Hayes suffered a loss of wage earning capacity as a result of her 2007 injury, entitling her to permanent partial-disability payments.

¶55.    Hayes injured her head, back, and neck in 2007. After treatment and reaching MMI, Hayes returned to her position as a coil winder; however, her doctor found a permanent

---

[17] Although Hayes presented a more complete argument in her brief in rebuttal to Howard Industries's reply brief, the failure to raise the argument in its initial brief deprived Howard Industries of the opportunity to rebut the authorities and argument Hayes later raised.

medical impairment of 2% to the whole person for her cervical spine and 5% to the whole person for her lumbar spine. Upon reviewing all the evidence presented, the Commission affirmed the AJ's findings that Hayes sustained a loss of wage-earning capacity from this injury and awarded her permanent-partial disability benefits resulting from this injury. On appeal, Howard Industries contends that the Commission erred in finding any loss of wage-earning capacity from this injury, arguing that the Commission relied solely on Hayes's vocational experts' testimony of loss of access to open market jobs and that Hayes's post-injury wages were unaffected, creating a presumption of no loss of wage-earning capacity that Hayes did not rebut.

¶56. Mississippi Code Annotated section 71-3-7(1) (Rev. 2021) provides that "[c]ompensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease." Compensation is paid to employees for permanent total disability, temporary total disability, and permanent partial disability. *Id.* "Disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." Miss. Code Ann. § 71-3-3(i) (Rev. 2021).

¶57. To be entitled to permanent partial disability payments for body-as-a whole injuries, a claimant must show, with medical proof, that he has a permanent medical impairment rating or permanent work restrictions that result in a loss of wage-earning capacity.

*Ameristar Casino-Vicksburg v. Rawls*, 2 So. 3d 675, 680 (¶20) (Miss. Ct. App. 2008) ("[T]he concept of disability comprises a physical injury coupled with a loss of wage-earning capacity.").

> The Commission's objective in determining post-injury earning capacity is to "determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured." *Karr v. Armstrong Tire & Rubber Co.*, 216 Miss. 132, 139, 61 So. 2d 789, 792 (1953). There are a number of factors the Commission should use to aid it in determining wage-earning capacity. The factors are:
>
> > (1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4) sympathy wages, (5) temporary and unpredictable character of post-injury earnings, (6) employee's inability to work, (7) employee's failure to be hired elsewhere, and (8) the continuance of pain and other related circumstances.

*Tew v. Siemens Power Transmission*, 156 So. 3d 329, 332 (¶11) (Miss. Ct. App. 2010).

¶58.    A presumption of no loss of wage-earning capacity arises when a claimant returns to work and earns the same or higher wages. *Karr*, 61 So. 2d at 792. However,

> the presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things: increase in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings.

*Id*. For example, in the *Tew* case, the claimant had injured his back and bladder while at work, which resulted in a 40% medical impairment to his body as a whole. *Tew*, 156 So. 3d at 331 (¶4). Tew's expert, Kathy Smith, testified that he would only earn between $6.81 and $9.43 per hour at jobs outside of Siemens, which was considerably less than the $18.02 per

33

hour he was making at Siemens. *Id*. at (¶5). The AJ and Commission found that Tew had proved a loss of wage-earning capacity, despite the higher wages he was earning at Siemens. *Id*. at 332 (¶12). On appeal, this Court agreed because the AJ and Commission had considered several factors, including Tew's age, education, work history, medical testimony, physical impairment, and current work status as well as the loss of wages at jobs Tews might receive on the open market, when determining Tew's loss of wage-earning capacity. *Id*.

¶59. Howard Industries argues that Hayes's case is similar to two cases where our appellate courts found that the claimant had not rebutted this presumption: *Pruitt v. Howard Industries Inc.*, 232 So. 3d 822 (Miss. 2017), and *McKenzie v. Howard Industries*, 323 So. 3d 520 (Miss. Ct. App. 2020). However, both cases are factually distinguishable from the case at hand.

¶60. In *Pruitt*, the claimant had injured his back and returned to work at a different accommodated position, earning higher wages. *Pruitt*, 232 So. 3d at 824 (¶¶2-3). The Commission found that he had not rebutted the presumption of no loss of wage-earning capacity. *Id*. at 824 (¶6). Pruitt appealed, arguing, inter alia, that he had a post-injury impairment and light-duty restrictions, that he could not do the same job that he did pre-injury, and that with his restrictions, he lost access to other jobs if he left Howard industries. *Id*. at (¶13). The supreme court affirmed the MWCC's denial of benefits, pointing out that that the vice-president of Howard Industries testified that Pruitt's accommodated job as a forklift operator was a necessary production job, *id*. at 326 (¶15), and that Pruitt had not shown that he was in any danger of being terminated. *Id*. at 327 (¶16). Notably, Pruitt had

not sought work elsewhere, *id,* nor had he presented any vocational expert testimony concerning his loss of access to jobs. Because there was sufficient evidence to support the Commission's denial of benefits, we affirmed. *Id*. at (¶17). In Hayes's case, however, Hayes did present valid and unrebutted vocational expert testimony concerning her loss of access to jobs on the open market. Moreover, Howard Industries presented no evidence that Hayes's coil winder position was a "necessary production job." So she could have been terminated at any time by Howard Industries.

¶61. In *McKenzie*, again the Commission had determined that the claimant had not rebutted the presumption of no loss of wage-earning capacity. *McKenzie*, 323 So. 3d at 527 (¶30). In that case, the claimant suffered a neck injury at work. *Id*. at 522 (¶3). After two neck surgeries, she returned to work with a 9% body as a whole impairment rating and light work restrictions. *Id*. at (¶5). On her return to work, she was assigned to a different machine to accommodate her restrictions and she earned higher wages. *Id*. at (¶6). Her vocational expert testified that after reviewing her age, education, work history and medical conditions, McKenzie had suffered a 14% loss of access of her pre-injury jobs at Howard Industries and a 25% loss of access to her past occupations. *Id*. at 523 (¶¶10, 11). However the expert testified that she had not physically or vocationally tested McKenzie and that her calculations were based on a nationwide labor market and not the localized region where McKenzie lived. *Id*. at (¶12). Howard Industries presented Pete Mills as its expert who testified that McKenzie's job was a necessary production job. *Id*. at 524 (¶12). Although the AJ awarded permanent-partial disability benefits, the Commission reversed. *Id*. at (¶17). On appeal, this

35

Court cited *Pruitt,* which we found to be factually similar, and upheld the Commission's denial of benefits. *Id*. at 526 (¶24). We found that the evidence showed that McKenzie had returned to work in a necessary production job and that she was in no danger of being terminated. *Id*. at (¶28). We further noted that the expert's opinions were questionable because she admitted that her calculations were based on a nation-wide sample. *Id.* We concluded that "[b]ecause we are bound by a limited, deferential standard of review, we cannot say that the Commission's decision was clearly erroneous." *Id*. at (¶30). In Hayes's case, again she did not have the "necessary production job" protection in her coil winder position. In addition, she presented unrebutted expert testimony to her loss of access to jobs both locally and nationally should she be terminated.

¶62.    More recently, we found the presumption rebutted in *Chambers v. Howard Indus.*, 310 So. 3d 833 (Miss. Ct. App. 2021), and *Kroger v. Pybus*, 327 So. 3d 678 (Miss. Ct. App. 2021),which we find more relevant to this case. In *Chambers*, a claimant who suffered a neck injury returned to work in his same position as a press operator. *Chambers*, 310 So. 3d at 835 (¶¶2, 4). Prior to the injury, Chambers earned $610.35, but due to an increase in hourly wages, after he returned to work he made $703.56. *Id.* at (¶4). In affirming the Commission's award of permanent disability payments, we held that Chambers had successfully rebutted the presumption by showing that Howard Industries had made his job easier by assigning a second brake-press operator to assist him. *Id*. at 836 (¶10). Additionally, we noted that Chambers' increase in pay was the result of increases in the general level of pay for everyone. *Id*. Moreover, Chambers also presented vocational expert

36

evidence to demonstrate that he would have a reduction in wages due to his injury in the open labor market if he were to become unemployed. *Id.* at 836 (¶9).

¶63. In *Kroger*, the claimant was a fifty-six-year-old grocery clerk who injured her pelvis when she was cleaning the restroom and was knocked to the floor by an incoming customer. *Kroger*, 327 So. 3d at 679 (¶3). Pybus was off for two years before reaching maximum medical improvement and returning to her pre-injury grocery clerk position. *Id*. The AJ initially denied her claim for permanent disability benefits because Pybus could "perform the substantial acts of her usual employment" and that "the evidence failed to support a loss of wage-earning capacity because Pybus's post-injury wages exceeded her pre-injury wages." *Id*. at (¶5). The Commission, however, reversed the AJ's ruling and found that Pybus provided sufficient evidence to rebut the presumption of no loss of wage-earning capacity. *Id*. at (¶6). The Commission instructed the AJ to consider the factors set forth in *Guardian Fiberglass v. LeSueur*, 751 So. 2d 1201, 1204-05 (¶10) (Miss. Ct. App. 1999), to determine a loss of wage-earning capacity, which included:

> (1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4) sympathy wages, (5) temporary and unpredictable character of post injury earnings, (6) his inability to work, (7) his failure to be hired elsewhere, and (8) the continuance of pain and any other related circumstances.

*Kroger*, 327 So. 3d at 681 (¶8). On remand, the AJ found that Pybus had successfully rebutted the presumption of no loss of wage-earning capacity and the Commission affirmed. *Id*. at (¶¶9-10). On Kroger's appeal, we noted that "decisions as to loss of wage-earning capacity are largely factual and are to be left largely to the discretion and estimate of the

Commission." *Id*. at 683 (¶16) (quoting *Neshoba Cnty. Gen. Hosp. v. Howell*, 999 So. 2d 1295, 1298 (¶8) (Miss. Ct. App. 2009)). We noted that in *General Electric v. McKinnon*, 307 So. 2d 363, 365 (Miss. 1987), the Mississippi Supreme Court recognized other evidence that could rebut the presumption of no loss of wage-earning capacity, in addition to those listed in *LeSuere*, noting that "the post-injury earnings are unreliable due to: increase in general wage levels since the time of accident, claimant's own greater maturity and training, longer hours worked by claimant after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable character of post-injury earnings." In *Kroger*, we held that the list of such evidence is not an exclusive one. *Kroger*, 327 So. 3d at 684 (¶19). We also discussed Chambers, and two cases cited by Howard Industries here, *McKenzie* and *Pruitt*. *Kroger*, 327 So. 3d at 689-90 (¶¶45-46). We reviewed the facts of those cases that were significant in this Court's decision in each. We reiterated that

> if the Commission's decision is supported by substantial evidence, we may not overturn the decision "even if, were this Court acting as fact-finder, we would have reached the opposite conclusion." *Neshoba Cnty. Gen. Hosp.*[*v. Howell*], 999 So. 2d [1295], 1298 (¶8) [(Miss. Ct. App. 2009)]. "[D]ecisions as to loss of wage-earning capacity are largely factual and are to be left largely to the discretion and estimate of the commission." *Id*. (internal quotation marks omitted). Furthermore, "[b]ecause the Commission is the ultimate fact-finder and judge of the credibility of the witnesses, this Court may not reweigh the evidence before the Commission." *Gregg* [*v. Natchez Trace Electr. Power Ass'n*], 64 So. 3d [473,]475 (¶8) [(Miss. 2011)].

*Kroger*, 327 So. 3d at 689 (¶47). We then reviewed the factors rebutting the presumption that Pybus had presented, including her testimony and that of her expert that Pybus was allowed to self-accommodate and work at her own pace. *Id*. at 690 (¶48). Her expert

described Pybus' official job duties of a grocery clerk, which the expert found exceeded the restrictions placed on Pybus in her FCE. *Id*. Moreover, at Pybus' age fifty-six, her chances of getting another job within her FCE restriction were slim. *Id*. She also had continuing pain from her injury. *Id*. We found that this evidence was sufficient to successfully rebut the presumption of no loss of wage-earning capacity and we affirmed the MWCC's decision. *Id*. at (¶49).

¶64. In this case, Hayes injured her head, back, and neck in 2007 and was treated for over a year by numerous physicians.[18] In September 2008, Dr. Vohra determined that she had reached MMI, and assessed a permanent medical impairment of 2% to the whole person for her cervical spine and 5% to the whole person for her lumbar spine. He released Hayes "to modified duty with the following restrictions: No lifting 7–10 lbs. No repetitive bending, stooping or twisting." In October 2008, Dr. Hamp Gaston, a physical therapist, performed a FCE on Hayes at Dr. Vohra's request. He concluded that she could sustain a medium level of work for an eight-hour day which included lifting 40 pounds floor to waist, 35 pounds waist to eye level; two-handed carry (35 pounds), one-handed carry (25 pounds), pushing (60 pounds), pulling (35 pounds on day one and 47 pounds on day two). He stated that

> according to the self-reported job demands, the client's abilities do not match the job requirements. Specifically, the patient states she would be unable to tolerate the heavy lifting (up to 60/70#) that would be required.

---

[18] In addition to Dr. Rahul Vohra, a physical medicine and rehabilitation specialist, at NewSouth NeuroSpine Clinic, other doctors assessing and treating her injuries between included Dr. Tirumaki, her initial treating the physician, Dr. Tanious, a neurologist, Dr. Barclay, Dr. Stringer, a neurosurgeon, and Dr. Katz, another physical medicine and rehabilitation doctor.

Dr. Vohra confirmed Dr. Gaston's conclusions in November 2008. Hayes returned to her prior position as a coil winder after reaching MMI. But Dr. Vohra opined in May 2019, that the physical restrictions related to this 2007 injury remained in effect.

¶65. Both of Hayes's vocational experts testified to factors relating to Hayes's loss of wage-earning capacity due to her 2007 injury. Bruce Brawner concluded that she had a 13% loss of access to her pre-injury jobs; an 11% loss of jobs on the market overall as determined by the "Guide to Occupational Exploration," and a 10% loss of jobs on the market per the "Dictionary of Occupational Titles." He also determined that the wages she could get at any of these jobs was considerably lower than those she was earning at Howard Industries. Kathy Smith reviewed Dr. Vohra's records and concluded that Hayes was functioning at a light to medium level after the 2007 injury. She used a specialized software specific to jobs in Mississippi and concluded that with these restrictions, Hayes loss of access to employment within the State was 9.8%. Both Brawner and Smith identified several positions for which Hayes might qualify given her restrictions. Both calculated the weekly wages that Hayes might be paid in such positions to range from $382 to $399 per week. This represented a substantial loss of income compared to Hayes's average weekly wage as a coil winder at Howard Industries. Moreover, given her restrictions, Hayes could not perform most of the jobs she had prior to her employment at Howard Industries.

¶66. Despite this testimony, Howard Industries argues that Hayes had no loss of wage-earning capacity because after her 2007 injury, she returned to her position as a coil winder, suffering no loss of wages, and even earned more over the years. However, the record

40

supports the MWCC's finding that Hayes had rebutted the presumption. It was undisputed that Hayes's wage increases after her 2007 injury were due to general raises negotiated by the union. Such general wage increases were deemed to be an unreliable basis for estimating wage earning capacity. As previously noted, in *Chambers* we found that the claimant had rebutted the presumption because his increased wages were applicable for a similar reason. *Chambers*, 310 So. 3d at 836 (¶9).

¶67. In addition, Hayes presented vocational testimony as noted above concerning her loss of job access on the open market. We found such evidence also supported the claimant in *Chambers*, stating "Chambers also presented vocational evidence to demonstrate that he would have a reduction in wages due to his injury in the open labor market if he were to become unemployed." *Chambers*, 310 So. 3d at 836 (¶9). Moreover, no one from Howard Industries testified that Hayes's position as a coil winder was a "necessary production position." Therefore, she had no job security at Howard Industries, which like any other industry could terminate her employment. At that point, Hayes would be required to find a job in the open market that would accommodate her restrictions, including limited lifting and maximum forty-hour weeks. We also note that Howard Industries presented no expert testimony to rebut the expert testimony that was presented by Hayes.

¶68. Moreover, the record reflects that even though forty-five-year-old Hayes had some college education, she never graduated. Prior to being hired at Howard Industries, she worked as a fast-food cook and manager, bingo-hall caller, restaurant crew member and manage (jobs that averaged $9.82 per hour). Hayes had limited lifting restrictions and took

41

pain medication on a daily basis. Vocational expert Smith said that in using the Dillman method to assess vocational impairment, she included all these factors:

> Q. . . . What factors did you consider to determine Ms. Hayes' vocational impairment?
>
> A. So her vocational – her impairment, medical impairment, the restrictions that's set forth by the physical and then I gathered information from her regarding her education and her work history and considered that in conjunction with the labor market in the Jones County and surrounding area of Jones County

Therefore, all factors affecting loss of wage-earning capacity were considered, not just loss of earnings.

¶69. Given the limited deferential standard of review, we find that the evidence as a whole supports the MWCC's findings that Hayes had rebutted the presumption and had sustained a loss of wage-earning capacity due to her 2007 injury for which she was entitled to permanent partial disability benefits.

**IV. Whether the evidence supports the Commission's finding of a 38% industrial loss of use as a result of Hayes's 2015 right shoulder injury.**

¶70. The Commission affirmed the payment of permanent partial disability benefits to Hayes on the basis of a 38% loss of industrial use due to her injury in 2015. Howard Industries argues that despite an only 5% medical impairment to Hayes's right shoulder, the Commission erred when it found a 38% industrial loss of use from her 2015 injury.

¶71. An employee who sustains a permanent partial loss of use of a member is entitled to a number of weeks of compensation pursuant to Mississippi Code Annotated section 71-3-17(c) (Rev. 2021). Section 71-3-17(c)(26) provides for compensation when there has been

either an anatomical loss of a body member or when there has been a vocational or industrial loss of use of a member.[19]

> In a scheduled-member case, a worker is always entitled to compensation for the medical or functional loss of his body part, regardless of whether the functional loss impacts his wage-earning capacity." *City of Laurel v. Guy*, 58 So. 3d 1223, 1226 (¶14) (Miss. Ct. App. 2011) (citing *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 745-46 (¶¶13-14) (Miss. 2002)). But . . . when the industrial loss is greater than the medical loss[,] . . . the claimant's industrial or occupational disability or loss of wage-earning capacity controls his degree of disability. *Id.* at (¶14).

*Bridgeman v. SBC Internet Servs. Inc.*, 270 So. 3d 112, 114 (¶6) (Miss. Ct. App. 2018). "In a scheduled-member claim . . . , a worker is entitled to the higher of the two types of losses—(1) functional loss or (2) occupational loss." *Howard Indus. Inc. v. Robbins*, 176 So. 3d 113, 117 (¶18) (Miss. Ct. App. 2015). Functional loss is the same as medical disability, *id.*, and loss of industrial use is loss of ability to perform the substantial acts of his or her usual occupation. *Sanderson Farms Inc. v. Jessie*, 185 So. 3d 397, 401 (¶15) (Miss. Ct. App. 2015).

¶72.    In *Robbins*, we reiterated that in a scheduled member case, "when the industrial loss is greater than the functional loss, the injured employee is entitled to the greater of the two." *Robbins*, 175 So. 3d at 115 (¶10). In that case, Robbins's medical doctor determined that

---

[19] This section regarding industrial loss of use reads:

(26) In any case in which there shall be a loss of, or loss of use of, more than one (1) member or parts of more than one (1) member set forth in subparagraphs (1) through (23) of this paragraph (c), not amounting to permanent total disability, the award of compensation shall be for the loss of, or loss of use of, each such member or parts thereof, which awards shall run consecutively, except that where the injury affects only two (2) or more digits of the same hand or foot, subparagraph (21) of this paragraph (c) shall apply.

43

Robbins suffered a 45% medical or functional impairment after surgery to repair a torn rotator cuff in Robbins' shoulder. *Id.* at 117 (¶19). After his injury, Howard Industries moved him to another position and his post-injury wage rose by more than $100. *Id*. at 115-16 (¶¶2, 6). Howard Industries argued that Robbins' continued employment and higher wages rebutted any presumption of a total industrial loss of his left arm and even that he suffered a greater industrial loss than his functional loss. *Id*. at 115 (¶2). The AJ, however, found that Robbins could not perform the substantial acts of his usual employment and that he could not perform any of the acts of his previous jobs due to the injury. *Id*. at 116 (¶10). Based on these findings, the AJ found that Robbins had suffered a total (100%) industrial loss and awarded benefits based on that loss. *Id*. The Commission affirmed the AJ's use of Robbins's industrial loss to set compensation benefits but lowered it to 90%. *Id*. at 117 (¶14). On appeal, we noted that industrial loss, also known as occupational loss, is "the functional or medical disability as it affects the claimant's ability to perform the duties of employment." *Id*. at (¶20). It deals with the degree of loss of use of the member for wage-earning purposes. *Id*. While there was precedent for rejecting a finding of total (100%) disability when a claimant earns higher wages after returning to work,[20] we noted that these cases do not say that earning a higher wage prevents finding a greater industrial loss than the medical or functional impairment. *Id*. at 117-18 (¶21). We stated:

> In *Jensen*, the supreme court held that when "a permanent partial disability renders a worker unable to continue in the position held at the time of injury, . . . such inability creates a rebuttable presumption of total occupational loss

---

[20] *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 745-59 (¶¶13-25) (Miss. 2002), and *City of Laurel v. Guy*, 58 So. 3d 1223, 1226-27 (¶¶15-18) (Miss. Ct. App. 2011).

of the member." (*Jensen*, at 747 (¶ 21). Of course, this presumption was "subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury." *Id.*

*Robbins*, 176 So. 3d at 119 (¶27). We quoted *Jensen* again, stating that "the ultimate determination must be made from the evidence as a whole considering loss of wage-earning capacity." *Robbins*, 175 So. 3d at 118 (¶22) (quoting *Jensen*, 828 So. 2d. at 748 (¶21)). This evidence includes "education and training which the claimant has had, his age, continuance of pain, and any other related circumstances." *Id.* Even though Robbins was earning higher wages than he did pre-injury due to raises negotiated by the union, Robbins was also seventy-nine years old, had limited education, continued to have pain and functional restrictions. *Id.* We noted that "[d]etermining industrial loss is a fact-intensive inquiry, which must be made on a case-by-case basis." *Id.* at (¶23). Because the Commission determined the facts, supported with substantial evidence, we affirmed. *Id.* at 119 (¶29)

¶73.    In *Prairie Farms Dairy v. Graham*, 270 So. 3d 37 (Miss. Ct. App. 2018), we also affirmed the higher loss of use percent when calculating permanent partial-disability benefits in a scheduled member case. There, the claimant suffered an injury to his knee and back while delivering milk to a grocery store. *Id.* at 39 (¶2). Graham's medical doctors assessed a 10% medical impairment to the knee, *id.* at (¶3), and restricted to lifting no more than forty pounds. *Id.* at 42 (¶14). However, the AJ and Commission found that Graham had sustained a 50% industrial loss of use due to the knee injury. *Id.* at 41 (¶8). On appeal, we cited *Robbins* and reiterated that

> an injury that renders a worker unable to continue in the position held at the
> time of injury creates a rebuttable presumption of total industrial loss of the

> member; however, this presumption is subject to other proof of the claimant's ability to earn the same wages he received at the time of injury.

The parties stipulated that Graham could not return to his prior position. *Id.* at 42 (¶14). Because he could only perform light duty work, Prairie Farms terminated his employment. *Id.* The claimant vocational expert opined that Graham could only earn $8 to $11 per hour in the open market. *Id.* at (¶13). The AJ and Commission assessed a 50% loss of industrial use of Graham's knee because the potential wages from other jobs were lower than Graham's his prior wages at Prairie Farms. *Id.* at (¶14). After reviewing the record, we found this evidence supported the Commission's findings of the higher industrial loss of use in calculating Graham's benefits. *Id.*

¶74. In this case, Dr. O'Keefe and Dr. Hobgood assessed a 5% permanent partial impairment to Hayes's right shoulder as a result of her 2015 injury. As a result of his evaluation, Dr. Hobgood further opined that Hayes was capable of only light duty work and limited her to an eight hour days. Hayes's vocational experts testified to higher percentage loss of industrial use. As a result of her limitations, it is undisputed that Hayes could not return to her pre-injury position as a coil winder, and that Howard Industries assigned Hayes a new position as coil winder trainee to accommodate her limitations. It is also undisputed that Hayes was restricted to a forty-hour week and could not earn the overtime pay that other coil winder trainees earned.

¶75. Howard Industries does not dispute Hayes's medical impairment rating and presented no expert testimony to rebut the opinions of Hayes's vocational experts, Smith and Brawner, as to the lesser earnings Hayes would make in the open market and her 38% loss of industrial

46

use due to the 2015 injury. Instead, Howard Industries argues that Hayes sustained no industrial loss of use because she was earning more in her accommodated position than she had earned in her pre-injury position.

¶76. To support its argument, Howard Industries relies on a pre-*Robbins* case, *Gaston v. Tyson Foods Inc.*, 122 So. 3d 797, 800 (¶12) (Miss. Ct. App. 2013), where we affirmed a Commission order denying increased benefits when a claimant failed to prove that she had an industrial loss of use greater than her medical impairment rating. But in that case, Gaston, who was still employed with Tyson had been moved from her original position in the washout department to the gizzard table where she could sit to accommodate her heel injury. *Id.* at 799 (¶4). She was moved again to the liver table to accommodate a shoulder injury Gaston later suffered. *Id.* at (¶¶4-5). In her current position, she made more money than in her prior positions and was given raises that other co-workers received. *Id.* at (¶5). Gaston's only argument for industrial-loss benefits, beyond her several medical impairment rating, was that she could not work in her original position in the washout department but had to be moved to accommodate her restrictions. *Id*. at 800 (¶11). We rejected this argument for higher industrial loss of use rating because Gaston was still employed at Tyson and made more money than she did pre-injury. *Id*. at (¶12).

¶77. Although in this case, Hayes was making a higher hourly wage in her accommodated position, *Gaston* is not applicable. First and foremost, although Hayes may be earning a higher *hourly* wage now than at her prior position as coil winder, Hayes cannot earn the overtime pay she received in that position. Thus, her *weekly* wages are not the same as what other coil winder trainers receive because she cannot work overtime. So where in *Gaston*,

47

the claimant was making more money post-injury, here Hayes was clearly not. Moreover, as in *Graham*, both of Hayes's vocational experts testified that she could not make on the open market what she was making at Howard Industries due to her restrictions, thereby affecting her overall wage earning ability. Brawner opined this injury resulted in a 25% loss of access to pre-injury jobs, a 38% loss of access to jobs in Hayes's past occupations, and a 42% loss of access to the open labor market. Hayes's other vocational expert, Smith, substantially agreed, testifying to loss of access in the open labor market of 59% with a 46% reduction in wages on the open market. Gaston presented no such testimony.

¶78. Examining the MWCC's findings and the substantial evidence in the record, we hold that the MWCC did not err in rejecting Howard Industries' higher wages argument and finding that Hayes did sustain a loss of industrial loss of use to her shoulder due to her 2015 injury. In addition, because her industrial loss of use percentage was higher than her medical impairment percentage, the Commission did not err in finding a 38% industrial loss of use in this case.

**Conclusion**

¶79. Because the record supports the MWCC's finding that Yoder had attempted to mislead the MWCC and delayed the proceedings by presenting an incorrect job analysis, we affirm the full Commission's impositions of sanctions on Yoder. However, we find no basis to impose such sanctions on Howard Industries or the expert Mills. We also affirm the full Commission's findings of Hayes' loss of wage-earning capacity for her 2007 injury and a 38% loss of industrial use for her 2015 injury, entitling her to permanent partial disability benefits for both.

¶80.   **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, McCARTY AND SMITH, JJ.  EMFINGER, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶81.   I concur that Hayes's awards of permanent partial disability should be affirmed, but the Commission's sanctions against attorney Lew Yoder should be reversed and rendered because Yoder did not make any misleading statement or offer any misleading evidence.[21]

¶82.   On April 30, 2019, Howard Industries filed its consolidated prehearing statement. Attachment 4 to the prehearing statement stated that Pete Mills would testify at the "hearing pursuant to his vocational report dated April 25, 2019, with Job Analysis," which was attached.  Mills's Job Analysis was titled "JOB ANALYSIS RE: <u>SELINA HAYES</u>" and described Hayes's responsibilities as a coil winder trainer at Howard Industries.  Mills's Job Analysis also provided the following information regarding Hayes's work hours:

| Work Hours: (time) 7:00am to 5:30pm. | Number of days per work week 6 days per week. | Overtime: hrs. per week approximately 20 hrs. per week. | How often: Weekly as needed. |
|---|---|---|---|

¶83.   Two days later, on May 2, 2019, Howard Industries filed a supplemental consolidated prehearing statement.  The supplemental statement had only one attachment: a revised

---

[21] Pursuant to Mississippi Code Annotated section 71-3-59(2) (Rev. 2021), the Commission ordered Yoder to pay a civil penalty of $1,000 and attorney's fees of $1,500. For the reasons discussed in this separate opinion, both sanctions should be reversed and rendered.

Attachment 4 that stated Mills would testify at the "hearing pursuant to his vocational report dated April 25, 2019, with *corrected* Job Analysis." (Emphasis added). Mills's corrected Job Analysis was again titled "JOB ANALYSIS RE: SELENA HAYES" and included the same description of her job responsibilities as a coil winder trainer. Mills's corrected Job Analysis then provided the following revised information regarding Hayes's work hours:

| Work Hours: (time) 7:00am to 3:30pm. | Number of days per work week 5 days per week. | Overtime: hrs. per week | How often: |
|---|---|---|---|

¶84. At the hearing on June 4, 2019, Mills explained why he prepared the corrected Job Analysis. Mills testified that after his original Job Analysis was filed and served, Yoder pointed out that the document incorrectly stated that Hayes's job required overtime when in fact she was working only forty hours per week pursuant to a doctor's restriction. Mills testified that he agreed his original analysis was in error and that he prepared the corrected analysis based on Hayes's actual work schedule. Mills testified that Hayes had the same responsibilities and other physical requirements as all other coil winder trainers. But Mills acknowledged that other coil winder trainers were required to work overtime and that "in this case, [Howard Industries] made an accommodation allowing [Hayes] only to work five days a week, eight hours a day." Yoder likewise stated, "[W]e'll stipulate that she's accommodated. We're . . . meeting the restrictions of [Hayes's doctor]." Yoder and Mills both explained that the Job Analysis was to intended to describe the physical requirements, responsibilities, and work hours of *Hayes's* job.

¶85. The Commission stated that the corrected Job Analysis is misleading because it "does

50

not indicate that [it] is a job analysis for an accommodated position, nor does [it] reflect that it an amended report." However, the cover page for the corrected Job Analysis stated that it was a "*corrected* Job Analysis." (Emphasis added). In addition, as noted above, the corrected Job Analysis was filed and served only two days after the original, and this was the only matter that Howard Industries supplemented in its supplemental prehearing statement. Thus, it *was* clear that Mills had amended the Job Analysis. Finally, although the analysis did not state that it was for an "accommodated position," it was appropriately titled "JOB ANALYSIS RE: SELENA HAYES" because it was an analysis of *Hayes's job*. At the hearing, Mills clarified any confusion regarding the document by testifying about its purpose and acknowledging that Howard Industries had accommodated Hayes by allowing her to work only forty hours per week. The corrected Job Analysis did *not* state—and Mills did *not* testify—that other coil winder trainers do not work overtime.

¶86.    At most, the record shows that there was a misunderstanding regarding the purpose of Mills's corrected Job Analysis, but Mills's testimony resolved any confusion. Perhaps it would have been helpful if the corrected Job Analysis had specifically explained that Hayes's work hours were the result of an accommodation, but the absence of such an explanation did not render it misleading. The corrected Job Analysis was exactly what it purported to be—an analysis of *Hayes's* job requirements. Therefore, the Commission clearly erred and abused its discretion by finding that Yoder offered misleading evidence and by sanctioning Yoder for offering a truthful, accurate expert report and testimony. Accordingly, the sanctions

51

against Yoder should be reversed and rendered, and I respectfully dissent in part.[22]

**GREENLEE, McCARTY AND SMITH, JJ., JOIN THIS OPINION.**

---

[22] The Commission not only sanctioned Yoder but also asserted that the Mississippi Bar should investigate him for a possible violation of Mississippi Rule of Professional Conduct 3.3(a)(4), which states in part that "[a] lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false." The majority opinion goes a step further by implying that Yoder may have committed a felony. *Ante* at ¶49 & n.14. For the same reasons the sanctions should be reversed and rendered, there is also no basis for professional discipline or criminal prosecution.